THOMAS R. KERR, KBA #38250
732 Scott Street
Covington, KY 41011
Telephone: 859/431-2222
859/431-3463 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID J. GEORGE
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF KENTUCKY

AT LOUISVILLE

| | | |
|---|---|---|
| CITY OF LIVONIA EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:10-cv-520-H |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | |
| ALMOST FAMILY, INC., WILLIAM B. YARMUTH and C. STEVEN GUENTHNER, | ) ) ) | |
| Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

## JURISDICTION AND VENUE

1.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

4.      In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## INTRODUCTION AND OVERVIEW

5.      This is a federal securities class action on behalf of purchasers of the common stock of Almost Family, Inc. ("Almost Family" or the "Company") between November 4, 2009 and June 30, 2010, inclusive (the "Class Period"), against Almost Family and certain of its officers and/or directors for violations of the Exchange Act.  These claims are asserted against Almost Family and certain of its officers and/or directors who made materially false and misleading statements during the Class Period in press releases, analyst conference calls, and filings with the SEC.

6.      During the Class Period, defendants issued materially false and misleading statements regarding the Company's operations and its business and financial results and outlook.  Defendants misled investors by failing to disclose that: (i) the Company was deliberately increasing the number of unnecessary home therapy visits in order to receive increased Medicare reimbursements; and (ii) as a result of defendants' conduct, the Company's reported sales and earnings were materially

inflated.  As a direct result of defendants' false statements, Almost Family's common stock traded at artificially inflated prices during the Class Period, reaching a high of $43.96 per shares on April 29, 2010.

7.      On April 26, 2010, *The Wall Street Journal* published an article entitled "Home Care Yields Medicare Bounty."  The article called into question whether four home healthcare companies, including Almost Family, were taking advantage of the Medicare reimbursement system.  More specifically, the article revealed that the home healthcare companies, such as Almost Family, billed a higher number of the most profitable home therapy visits for their Medicare patients, while at the same time billing fewer of the least profitable therapy visits.  The article specifically mentioned Almost Family along with three other home healthcare companies: Amedisys Inc. ("Amedisys"), LHC Group Inc. ("LHC"), and Gentiva Health Services, Inc. ("Gentiva").

8.      In response to the April 26, 2010 *Wall Street Journal* article, on May 13, 2010, U.S. Senate Finance Committee ("Senate Committee") Chairman Max Baucus and Ranking Member Chuck Grassley sent a letter to Almost Family questioning the connection between the number of home health therapy visits and the Medicare reimbursement rates for those visits.  The Senators further requested that Almost Family "answer questions related to their internal policies and guidelines regarding the number of visits . . . and the rate of reimbursements" and "provide marketing materials and guidelines for patients and physicians as well as clinical criteria used in developing those materials."

9.      On July 1, 2010, before the market opened, Almost Family announced that the Company had received a civil subpoena for documents and a notice of an investigation from the SEC.  The subpoena seeks all documents relating to "the Company's home health care services and operations, including reimbursements under the Medicare home health prospective payment system,

since January 1, 2000." As a result of this negative news, Almost Family's common stock plunged $3.88 per share or 11.11%, on July 1, 2010, on high volume.

## PARTIES

10.    Plaintiff City of Livonia Employees' Retirement System, located in Wayne County, Livonia, Michigan, as set forth in the accompanying certification and incorporated by reference herein, purchased the common stock of Almost Family during the Class Period and has been damaged thereby.

11.    Defendant Almost Family is incorporated in Delaware and maintains its principal executive office at 9510 Ormsby Station Road, Suite 300, Louisville, Kentucky 40223, in Jefferson County, Kentucky. Almost Family has branch locations in Florida, Kentucky, Connecticut, New Jersey, Ohio, Massachusetts, Alabama, Missouri, Illinois, Pennsylvania and Indiana.

12.    Defendant William B. Yarmuth ("Yarmuth"), a resident of Jefferson County, Kentucky, is, and was at all relevant times, President, Chief Executive Officer and Chairman of the Board of Almost Family.

13.    Defendant C. Steven Guenthner ("Guenthner"), a resident of Jefferson County, Kentucky, is, and was at all relevant times, Senior Vice President and Chief Financial Officer of Almost Family. During the Class Period, while Almost Family's stock price was artificially inflated, defendant Guenthner sold 20,000 shares of his Almost Family stock at $42.04 per share for insider trading proceeds of more than $840,000.

14.    Defendants Yarmuth and Guenthner are collectively referred to herein as the "Individual Defendants."

15.    During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Almost Family, were privy to confidential and proprietary information concerning Almost Family, its operations, finances, financial condition and present and future

business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Almost Family, as discussed in detail below.  Because of their positions with Almost Family, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

16.   The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Almost Family's business.

17.   The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

18.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Almost Family's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Almost Family's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

19.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Almost Family's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. Defendants deceived the investing public regarding Almost Family's business, operations and management and the intrinsic value of Almost Family's securities and caused plaintiff and members of the Class to purchase Almost Family common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Almost Family during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

21.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Almost Family's common stock was actively traded on the NASDAQ.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Almost Family or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

22.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

23.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

24.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Almost Family;

(c)     whether the price of Almost Family common stock was artificially inflated during the Class Period; and

(d)      to what extent the members of the Class have sustained damages and the proper measure of damages.

25.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

26.      Almost Family was founded in 1976, and is the leading regional provider of home health nursing services, with over 100 locations in eleven states.  Almost Family and its subsidiaries operate two segments, a Medicare-certified visiting nurse segment, which is 85% of the Company's business, and a personal care segment.  The visiting nurse segment is commonly referred to as the "Medicare certified home health business, skilled intermittent care."  The goal of Almost Family is to allow seniors to remain in their homes as long as possible. The average patient is over 80 years old with many co-morbid conditions.  The Company's services are covered by federal and state government programs, commercial insurance, as well as private pay.

27.      Throughout the Class Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (a) the Company's reported sales and earnings growth was materially impacted by a scheme whereby the Company intentionally increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system, as those excess visits were not always medically necessary; (b) the Company's reported sales and earnings were inflated by defendants' scheme and subject to recoupment by

Medicare; (c) the Company was in material violation of its Code of Ethics & Business Conduct, at all relevant times, due to the scheme to inflate its Medicare revenues; and (d) based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company and its financial performance, prospects and growth.

**MATERIALLY FALSE AND MISLEADING STATEMENTS
ISSUED DURING THE CLASS PERIOD**

28.     The Class Period begins on November 4, 2009.  On that date, Almost Family issued a press release announcing its financial results for the three months ended September 30, 2009. Defendant Yarmuth commented on the results, stating, in pertinent part, as follows:

> "We're very pleased to once again report record operating results, especially in what is seasonally a down quarter in our Florida markets.  Despite the immense amount of noise surrounding Federal health care reform activities, our managers have maintained their focus on our patients and referral sources to achieve these results.  Whatever the outcome of the current health care reform efforts might bring, we are positioning our Company to thrive and grow as a major consolidator in the home health care industry."

29.     Further, the Company in the November 4, 2009 press release stated, in pertinent part, as follows:

**Third Quarter Financial Results**

Almost Family reported third quarter 2009 net service revenues of $76.3 million, a 31% increase from $58.4 million in the third quarter of 2008.

Net income for the third quarter of 2009 was $6.2 million, or $0.73 per diluted share, compared to $4.7 million, or $0.56 per diluted share, in the third quarter of 2008. The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 1% between periods.

**Third Quarter Segment Results**

Net revenues in the Visiting Nurse segment for the third quarter of 2009 were $65.7 million, a 35% increase from $48.6 million in the third quarter of 2008.  The total revenue growth of $17.1 million came from a 24% organic growth rate plus $7.1 million from acquired operations.  Organic Medicare admissions growth was 11% and organic Medicare Episodic growth was 25%.  Operating income before

- 8 -

corporate expense in the VN segment for the third quarter of 2009 was $13.4 million, a 34% increase from $10.0 million in the third quarter of 2008.

Net revenues in the Personal Care (PC) segment for the third quarter of 2009 were $10.6 million, an 8% increase from $9.8 million in the third quarter of 2008.  Operating income before unallocated corporate expense in the PC segment for the third quarter of 2009 was $1.3 million, a 40% increase from $902,000 in the third quarter of 2008.

The Company also noted that its Visiting Nurse segment operations located in Florida normally experience higher admissions during the first quarter and lower admissions during the third quarter than in the other quarters due to seasonal population fluctuations.

**Nine Month Period Ended September 30, 2009**

Almost Family reported net service revenues for the nine month period ended September 30, 2009 of $219.8 million, a 51% increase from $145.6 million in the same period of 2008.

Net income for the nine month period of 2009 was $17.8 million, or $2.14 per diluted share, compared to $11.1 million, or $1.52 per diluted share, in the nine month period of 2008.

**Nine Month Period Segment Results**

Net revenues in the Visiting Nurse segment for the nine month period of 2009 were $188.4 million, a 61% increase from $117.3 million in the nine month period of 2008.  The total revenue growth of $71.1 million came from a 32% organic growth rate plus $39.7 million from acquired operations.  Operating income before corporate expense in the VN segment for the nine month period of 2009 was $38.9 million, a 62% increase from $24.0 million in the same period of 2008.

Net revenues in the Personal Care (PC) segment for the nine month period of 2009 were $31.4 million, an 11% increase from $28.3 million in the nine month period of 2008.  Operating income before unallocated corporate expense in the PC segment for the nine month period of 2009 was $3.6 million, a 48% increase from $2.4 million in the nine month period of 2008.

**Stock Offering**

In the quarter ended September 30, 2009, the Company sold 967,556 shares of its common stock in a series of open market transactions at a weighted average price of $29.71.  Net proceeds of approximately $28 million were used to repay obligations under the Company's bank credit facility.  As of September 30, 2009, the Company had approximately $10 million in cash on hand.

30.     Also on November 4, 2009, the Company filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2009.  The Company's Form 10-Q was signed by defendants Yarmuth and Guenthner and reiterated the Company's financial results.  In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-Q contained certifications signed by Yarmuth and Guenthner stating that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." Regarding the Company's Medicare reimbursement, the Form 10-Q stated in pertinent part, the following:

## 2.  Net Revenues

*The Company is paid for its services primarily by federal and state third-party reimbursement programs, commercial insurance companies and patients. Revenues are recorded at established rates in the period during which the services are rendered.  Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.*

Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation.  It is common for issues to arise related to: 1) medical coding, particularly with respect to Medicare, 2) patient eligibility, particularly related to Medicaid, 3) the determination of cost-reimbursed revenues, and 4) other matters unrelated to credit risk, all of which may result in adjustments to recorded revenue amounts.  Management evaluates the potential for revenue adjustments and when appropriate provides allowances for losses based upon the best available information. There is at least a reasonable possibility that recorded estimates could change by material amounts in the near term.

## 3.  Segment Data

The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). Reportable segments have been identified based upon how management has organized the business by services provided to customers and the criteria in ASC 280, Segment Reporting.

The Company's VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or day of care. Approximately 90% of the VN

segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.

The Company's PC segment services are also provided in patients' homes. These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are generated on an hourly basis. Approximately 66% of the PC segment revenues are generated from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

31.     In response to the Company's press release, on November 4, 2009, the price of Almost Family's stock rose $2.03 per share, or 6.42%, to close at $33.66 per share.

32.     On February 24, 2010, Almost Family issued a press release announcing its financial results for the three months and full year ended December 31, 2009.   Defendant Yarmuth commented on the results, stating, in pertinent part, as follows:

"Our fourth quarter results serve to top off another milestone year in the development of our Company.  During 2009, we, along with other home health industry leaders, devoted substantial time and attention to national health care reform activities.  We feel we made great strides in improving the perception of home health care in the minds of legislators and other policy makers.  Against this backdrop, our management team and over 6,000 caregivers continued their uncompromising focus on providing high quality home care to our patients and quality returns for our shareholders.  Our fourth quarter and full year results demonstrate our continued ability to generate organic revenue and earnings growth.  With our strong balance sheet and our position as one of the nation's larger providers we believe we are well positioned for continued growth both organically and as a consolidator in our industry."

33.     Additionally, in the February 24, 2010 press release, the Company stated, in pertinent part, as follows:

**Fourth Quarter Financial Results**

Almost Family reported fourth quarter 2009 net service revenues of $78.0 million, an 18.4% increase from $65.9 million in the fourth quarter of 2008.

Net income for the fourth quarter of 2009 was $6.8 million, or $0.73 per diluted share, compared to $5.2 million, or $0.62 per diluted share, in the fourth quarter of 2008.  The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 11% between periods.  Results for

the quarter included costs of $238,000 or $0.03 per diluted share related to a terminated acquisition.

**Fourth Quarter Segment Results**

Net revenues in the Visiting Nurse segment for the fourth quarter of 2009 were $67.6 million, a 22% increase from $55.7 million in the fourth quarter of 2008. The total revenue growth of $12.0 million came from a 19% organic growth rate plus $1.3 million from acquired operations. Organic Medicare admissions growth was 13% and organic Medicare Episodic growth was 18%. Operating income before corporate expense in the VN segment for the fourth quarter of 2009 was $14.9 million, an 18% increase from $12.6 million in the fourth quarter of 2008.

Net revenues in the Personal Care (PC) segment for the fourth quarter of 2009 were $10.4 million, a 2% increase from $10.2 million in the fourth quarter of 2008. Operating income before unallocated corporate expense in the PC segment for the fourth quarter of 2009 was $1.5 million, a 14% increase from $1.3 million in the fourth quarter of 2008.

**Full Year Financial Results**

Almost Family reported net service revenues for the twelve month period ended December 31, 2009 of $297.8 million, a 41% increase from $211.5 million in the same period of 2008.

Net income for the twelve month period of 2009 was $24.6 million, or $2.86 per diluted share, compared to $16.3 million, or $2.16 per diluted share, in the twelve month period of 2008. Results for the twelve month period of 2009 included acquisition transactions costs of $463,000 or $0.06 per diluted share.

**Full Year Segment Results**

Net revenues in the Visiting Nurse segment for the twelve month period of 2009 were $256.1 million, a 48% increase from $173.0 million in the twelve month period of 2008. The total revenue growth of $83.1 million came from a 29% organic growth rate plus $43.8 million from acquired operations. Operating income before corporate expense in the VN segment for the twelve month period of 2009 was $53.8 million, a 47% increase from $36.6 million in the same period of 2008.

Net revenues in the Personal Care (PC) segment for the twelve month period of 2009 were $41.8 million, an 8% increase from $38.5 million in the twelve month period of 2008. Operating income before unallocated corporate expense in the PC segment for the twelve month period of 2009 was $5.2 million, a 37% increase from $3.8 million in the twelve month period of 2008.

34.     Following the issuance of the February 24, 2010 press release, the Company hosted a conference call with analysts and investors to discuss the Company's earnings and operations.

During the conference call, defendants made numerous positive statements about the Company's business, operations and prospects.

35.     On February 25, 2010, Almost Family filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2009.  The Company's Form 10-K was signed by Yarmuth and Guenthner and reiterated the Company's financial results.  In addition, pursuant to SOX, the Form 10-K contained certifications signed by Yarmuth and Guenthner stating that the Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  The Form 10-K stated, in pertinent part, the following regarding Medicare reimbursements:

### *Medicare Rates*

On October 1, 2000, Medicare implemented the Prospective Payment System ("PPS") and began paying providers of home health care at fixed, predetermined rates for services and supplies bundled into 60-day episodes of home health care.  An episode of home health care spans a 60-day period, starting with the first day a billable visit is furnished to a Medicare beneficiary and ending 60 days later.  If a patient is still in treatment on the 60th day a new episode begins on the 61st day regardless of whether a billable visit is rendered on that day and ends 60 days later. The first day of a consecutive episode, therefore, is not necessarily the new episode's first billable visit.  A base episode payment is established by the Medicare Program through federal legislation for all episodes of care ended on or after the applicable time periods detailed below:

| Period | Base episode Payment (1) |
|---|---|
| January 1, 2007 through December 31, 2007 | $     2,339 |
| January 1, 2008 through December 31, 2008 | $     2,270 |
| January 1, 2009 through December 31, 2009 | $     2,272 |
| January 1, 2010 through December 31, 2010 | $     2,313 |

(1)     The actual episode payment rates, as presented in the table vary, depending on the home health resource groups ("HHRGs") to which Medicare patients are assigned and the per episode payment is typically reduced or increased by such factors as the patient's clinical, functional, and services utilization characteristics.

Under PPS for Medicare reimbursement, we record net revenues based on a reimbursement rate that varies based on the severity of the patient's condition, service needs and other related factors. We record net revenues as services are rendered to patients over the 60-day episode period. At the end of each month, a portion of our revenue is estimated for episodes in progress.

Medicare reimbursement on an episodic basis, is subject to change if the actual number of therapy visits differs from the number anticipated at the start of care or if the patient is discharged but readmitted to another agency within the same 60-day episodic period. Our revenue recognition under the Medicare reimbursement program is based on certain variables including, but not limited, to: (i) changes in the base episode payments established by the Medicare Program; (ii) adjustments to the base episode payments for partial episodes and for other factors, such as case mix, geographic wages, low utilization and intervening events; and, (iii) recoveries of overpayments. Adjustments to revenue result from differences between estimated and actual reimbursement amounts, an inability to obtain appropriate billing documentation or authorizations acceptable to the payor and other reasons unrelated to credit risk. We recognize Medicare revenue on an episode-by-episode basis during the course of each episode over its expected number of visits.

In October 2009 the Centers for Medicare & Medicaid Services ("CMS") published regulations specifying Medicare home health reimbursement rates for 2010. Medicare rates for 2010 include a "market basket update" rate increase of 2.0% plus a 2.5% "outlier policy" adjustment less a 2.75% "case mix creep" adjustment. Accordingly, 2010 Medicare rates are about 1.75% higher than in 2009.

\*      \*      \*

**Code of Ethics and Business Conduct**

The Company has adopted a Code of Ethics and Business Conduct that applies to all its directors, officers (including its chief executive officer, chief financial officer, chief accounting officer and any person performing similar functions) and employees. The Company has made the Code of Ethics and Business Conduct available on its website at www.almostfamily.com.

36.    The Company's Code of Ethics & Business Conduct which is included on the

Company's Corporate Compliance page of its website, states in pertinent part as follows:

**Provide Accurate and Complete Documentation**

Client care must be necessary, appropriate and well documented. We must ensure the medical necessity of the care provided and verify client eligibility as needed. In addition, we will accurately record all services provided, and document physician authorization.

Improper coding of services and care provided (i.e., upcoding, fragmentation, use of obsolete or inappropriate coding) will not be tolerated and will result in immediate sanctions (i.e., disciplinary action, termination, substantial fines).

**Always Obey the Law**

We will conduct our business in accordance with all applicable laws and regulations. Compliance with the law does not compromise our ethical responsibility. Rather, it provides the minimum, absolute, essential condition for performance of our duties.

\*       \*       \*

**Generate Accurate Billing and Claims**

We will generate billing and claims accurately reflecting that services rendered are supported by relevant documentation and are submitted in compliance with applicable laws, rules, regulations and program requirements. We will never intentionally make or present improper, false, fictitious or fraudulent claims to any government or private health care program, employee, department or agency. Honesty and accuracy in billing and in the making of claims for Medicare or Medicaid payment is vital.

37.     As a direct result of defendants' false statements, Almost Family's common stock traded at artificially inflated prices during the Class Period, reaching a high of $43.96 per share on April 29, 2010.

38.     On April 26, 2010, *The Wall Street Journal* published an article entitled "Home Care Yields Medicare Bounty." The article called into question whether Almost Family and its competitors were improperly taking advantage of a change in the Medicare reimbursement system by increasing the number of in-home therapy visits for patients. The change, which occurred in 2008, provided for additional payments at 6, 14 and 20 therapy visits. The article stated, in pertinent part:

Home health care – treating sick patients in their homes rather than paying for costly hospitalizations – is the fastest growing area of the health-care industry, aimed at saving billions of dollars every year.

But an analysis by The Wall Street Journal of Medicare payments to home health-care companies in recent years raises questions about whether some

- 15 -

companies – including the sector's largest, Amedisys Inc. – are taking advantage of the Medicare reimbursement system.  The results show that the number of in-home therapy visits tracks Medicare financial incentives.

*      *      *

Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits.  Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits.  It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits.  That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-care policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.

According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment.  In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more.  In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.

"I was told 'we have to have ten visits to get paid,'" says Tracy Trusler, a former Amedisys nurse for two years in Tennessee, who has since left the company.  Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment.

"The tenth visit was not always medically necessary," Ms. Trusler says.

*      *      *

Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned last month that home health "overpayments contribute to the insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay.

*      *      *

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

The pattern of clustered visits around reimbursement targets is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.

During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedPAC suggested for the first time last month that the Secretary of Health and Human Services "review home health agencies that exhibit unusual patterns of claims for payment."

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.

*       *       *

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period.

The generous Medicare reimbursements are one reason the home health-care industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002.

*       *       *

To conduct its analysis, The Journal enlisted Henry Dove, a professor at Yale University's School of Public Health and an expert in analyzing Medicare data. Mr. Dove mined Medicare's database to determine how often between 2005 and 2008 various home-health companies sent therapists to patients' homes during a 60-day period of care, and whether the number of visits coincided with Medicare financial incentives.

Mr. Dove found the pattern of clustering visits at reimbursement trigger points was industry wide. The three other publicly traded home-health companies saw similar movements from 2007 to 2008. LHC Group Inc., for instance, saw the percentage of patients getting 10 visits in 2008 drop by 64% from 2007. For Gentiva Health Services Inc., the 10-visit percentage fell 27%, and at Almost Family Inc., the percentage fell 39%.

*       *       *

Steven Guenthner, chief financial officer of Almost Family, said that when Medicare revised its reimbursement rates in 2000 – creating a bonus of about $2,200 for patients reaching 10 therapy visits – the policy had "a serious flaw." The rates encouraged home health agencies, including Almost Family, to seek out patients who had illnesses that required at least 10 visits, Mr. Guenthner said. Almost Family

focused on hip and knee problems because those patients tend to need 10 to 13 therapy visits, he said.

Illnesses that require fewer visits may not get as much attention under the Medicare reimbursement rules. "It's not that we turned down patients," Mr. Guenthner said. "It's where you focus your scarce resources." The combination of limited home health resources to attract patients and the government's reimbursement policy "was like a moth to a flame," he said.

39.     Almost Family's stock barely dropped on this news as Guenthner's statement suggested the additional visits were based on patient need, as opposed to a deliberate attempt by the Company to increase visits beyond nine visits.

40.     On April 28, 2010, Almost Family issued a press release announcing its financial results for the three months ended March 31, 2010.  Defendant Yarmuth commented on the results, stating, in pertinent part, as follows:

"We're very pleased to report our first quarter operating results which truly highlight the strength of our underlying core business.  Our VN segment generated 20% organic revenue growth over the same quarter last year. . . . The recent passage of health care reform legislation now provides us with reasonable reimbursement visibility for the next three years.  Combined with our strong financial condition and access to additional capital, this reimbursement clarity positions us to take advantage of our acquisition opportunities which have largely been on hold for the past year."

41.     Further, the Company in its April 28, 2010 press release stated, in pertinent part, as follows:

**First Quarter Financial Results**

Almost Family reported first quarter 2010 net service revenues of $81.8 million, an 18.6% increase from $68.9 million in the first quarter of 2009.

Net income for the first quarter of 2010 was $7.4 million, or $0.80 per diluted share, compared to $5.6 million, or $0.68 per diluted share, in the first quarter of 2009.  The weighted average shares outstanding for purposes of calculating diluted earnings per share increased 13% between periods.

**First Quarter Segment Results**

> Net revenues in the Visiting Nurse segment for the first quarter of 2010 were $71.5 million, a 22% increase from $58.7 million in the first quarter of 2009. The total revenue growth of $12.8 million came from a 17% organic growth rate plus $1.0 million from acquired operations. Organic Medicare admissions growth was 13% and organic Medicare Episodic growth was 16%. Operating income before corporate expense in the VN segment for the first quarter of 2010 was $15.9 million, a 30% increase from $12.2 million in the first quarter of 2009.

> Net revenues in the Personal Care (PC) segment for the first quarter of 2010 were flat at $10.2 million for the first quarter of 2010 and 2009. Operating income before unallocated corporate expense in the PC segment for the first quarter of 2010 was $1.3 million, a 13% increase from $1.1 million in the first quarter of 2009.

42.     Also on April 28, 2010, the Company filed a press release correcting a typographical error. The Company's Form 8-K/A containing the press release stated, as follows:

> On April 28, 2010, Almost Family, Inc. (the "Company") issued a press release announcing its financial results for the quarter ended March 31, 2010, a copy of which was filed on Form 8-K. The purpose of this Form 8-K/A is to correct a typographical error in the second sentence of the first paragraph under the heading "First Quarter Segment Results" in the press release. As corrected, the sentence should read in its entirety as follows: "The total revenue growth of $12.8 million came from a 20% organic growth rate plus $1.0 million from acquired operations."

43.     Following the issuance of the April 28, 2010 press release, the Company hosted a conference call with analysts and investors to discuss the Company's earnings and operations. During the conference call, defendants made numerous positive statements about the Company's business, operations and prospects. During the conference call, analyst Kevin Campbell at Avondale Partners mentioned the April 26, 2010 *Wall Street Journal* article:

> Good morning. Thanks for taking my question. I was curious if you could just provide some comment on the *Journal* article from yesterday, just your initial reaction to it.

44.     Defendant Yarmuth responded as follows:

> Well, we probably have a lot of comments. I think that both Steve and I have some discussions about – we had some thoughts about it and we think – basically we believe that some of the information or the article was to some degree – I think Steve had a quote in there that said that he thought that the reimbursement system was –

had some serious flaws in it. And I think we sort of believe that the article had some serious flaws in it also in terms of its – some of the numbers and the issues.

We did not to my knowledge confirm or agree with the data that was presented to us in that article. But generally, I think our read of the article was [sic] essentially goes like this that the federal government realized that the reimbursement system had some flaws in it from 2000 and that they put – changed the reimbursement system in 2008. And there's a quote in the – and the quote in the article from somebody from – Mr. Wilson from CMS who talked about the – their intent in changing the reimbursement in 2008 was to create some incentive for essentially providers to care for those who were in need. And that obviously they thought that there were people in the industry or people who were in need of home healthcare who weren't being potentially serviced because of flaws in the reimbursement system. And they changed those to put incentives in place for that to happen. And the industry responded, as we did, in terms of taking care of patients who otherwise – who we did not take care of in the previous year, in 2007.

So we were taking care of a lot of different people in 2008 than we were taking care of in 2007 who had different medical conditions and different clinical needs and different needs – levels of service. And we, as we always do, go about trying to provide the care that the patient needs based upon their clinical condition. And I think that the – in some ways the industry responded to what the government wanted the industry to do. And I think there are people that are being cared for now that maybe weren't being cared for before. And that's a good thing. And there's more people that are being cared for now than there were before, and that's good thing. And I think the narrow focus on the ten visits was – doesn't really get to the point of why the reimbursement system was changed.

And clearly, once again, in this article between 2007 and 2008 for us, we took care of a lot of different types of patients. So I think there were some implications in the article that were not necessarily – that weren't necessarily true. And I think if you really look at the article you'll see that what happened – as has happened over the history of healthcare, Medicare healthcare, as we've observed, the federal government decides that they want – they create their reimbursement systems to achieve certain objectives. And providers typically respond to those objectives that the government creates a reimbursement system for, i.e., DRG's when the hospitals were in – when the hospitals put the DRG system back in the 1980's, length of stays declined. And it's pretty simple. And I think, really, what we did in this – I don't think that the article said this, but I think our position is is the government wanted to create a greater distribution of care across a broader basis of people who are in need, and the industry responded.

45.     On April 29, 2010, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2010.  The Company's Form 10-Q was signed by Yarmuth and Guenthner and reiterated the Company's financial results.  In addition, pursuant to

SOX, the Form 10-Q contained certifications signed by Yarmuth and Guenthner stating that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." The Form 10-Q discussed the Company's reliance on Medicare reimbursements, by stating, in pertinent part, as follows:

**2. Net Service Revenues**

The Company is paid for its services primarily by federal and state third-party reimbursement programs, commercial insurance companies and patients. Revenues are recorded at established rates in the period during which the services are rendered. Appropriate allowances to give recognition to third party payment arrangements are recorded when the services are rendered.

Laws and regulations governing the Medicare and Medicaid programs are extremely complex and subject to interpretation. From time to time issues may arise related to: 1) medical coding, particularly with respect to Medicare, 2) patient eligibility, particularly related to Medicaid, and 3) other matters unrelated to credit risk, all of which may result in adjustments to recorded revenue amounts. Management evaluates the potential for revenue adjustments and when appropriate provides allowances for losses based upon the best available information. There is at least a reasonable possibility that recorded estimates could change by material amounts in the near term.

**3. Segment Data**

The Company has two reportable segments, Visiting Nurse (VN) and Personal Care (PC). Reportable segments have been identified based upon how management has organized the business by services provided to customers and the criteria in ASC 280, Segment Reporting.

The Company's VN segment provides skilled medical services in patients' homes largely to enable recipients to reduce or avoid periods of hospitalization and/or nursing home care. VN Medicare revenues are generated on a per episode basis rather than a fee per visit or day of care. Approximately 92% of the VN segment revenues are generated from the Medicare program while the balance is generated from Medicaid and private insurance programs.

The Company's PC segment services are also provided in patients' homes. These services (generally provided by paraprofessional staff such as home health aides) are generally of a custodial rather than skilled nature. PC revenues are

generated on an hourly basis. Approximately 68% of the PC segment revenues are generated from Medicaid and other government programs while the balance is generated from insurance programs and private pay patients.

Certain general and administrative expenses incurred at the corporate level have not been allocated to the segments.

46.     On May 12, 2010, Almost Family's stock closed at $42.59 per share. It was on that day that Guenthner sold 20,000 shares of his Almost Family stock at $42.04 per share, reaping proceeds of approximately $840,000.

## THE TRUTH BEGINS TO SLOWLY EMERGE

47.     Then on May 13, 2010, the Senate Committee issued a release stating that it had started an investigation prompted by the April 26, 2010 *Wall Street Journal* article. The release stated that the Committee would "Question For-Profit Home Health Agencies on Relationship Between Operating Procedures and Reimbursements." The release further stated that "[f]inance leaders begin investigation after data suggests agencies intentionally increased the frequency of home health visits to trigger higher reimbursement rates." It went on, in pertinent part, to state:

Senate Finance Committee Chairman Max Baucus (D-Mont.) and Ranking Member Chuck Grassley (R-Iowa) today sent a letter to the four largest for-profit home health care agencies, asking questions about the relationship between the number of home health therapy visits they provided and the Medicare reimbursement rate for those visits. The Senators' letters come after a recent *Wall Street Journal* analysis, which found that as the Medicare reimbursement rate for home health care changed, companies changed their business practices to achieve higher reimbursements.

Baucus and Grassley also questioned the companies regarding their promotional material, after the Committee obtained a patient questionnaire that appeared to be designed to help the company target Medicare patients for which it could be reimbursed.

"Too many Americans count on Medicare to provide quality health care to allow the program to be manipulated for somebody else's profit," said Baucus. "If for-profit companies want to work with the Medicare program, we have to hold them to a very high standard. Companies that work with Medicare should not be allowed to target seniors just because they have Medicare or adjust the way they care for patients simply to increase profits. I intend to closely review the practices of these

- 22 -

and all companies working with the Medicare program to stop fraud, waste and abuse and ensure every dollar is used appropriately."

"Every dollar wasted is taken away from Medicare beneficiaries," Grassley said. "We need to make sure care is provided based on patients' best interests, not profit margins. So far, it appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both. As the Senate committee of jurisdiction, we're working to figure out what's going on."

The Senators asked Amedisys, **Almost Family, Inc.**, Gentiva Health Services, Inc., and the LHC Group, Inc. to answer questions related to their internal policies and guidelines regarding the number of visits provided to each patient, after data indicated a connection between the number of visits and the rate of reimbursement. According to the *Journal*'s analysis, after Medicare rates increased for patients receiving more than nine visits, the number of Amedisys patients who received 10 visits was three times the number of patients who received nine visits. Baucus and Grassley also asked the companies about changes to their policies following changes to Medicare reimbursement rates in 2008, changes that were described by both the *Journal*'s data and a March 2010 analysis by the Medicare Payment Advisory Commission (MedPAC). When the basis for Medicare payments shifted to 6, 14 or 20 visits, Amedisys patients getting 10 visits dropped by 50 percent, patients getting 14 visits rose 33 percent, and patients getting 20 visits increased 41 percent.

48.      The Senators also asked the companies to provide marketing materials and guidelines for patients and physicians as well as the clinical criteria used in developing those materials. The Senators expressed concern that these companies were using marketing tactics to target seniors 65 years old and older so the companies could take advantage of Medicare payments to improve profits.

49.      The May 13, 2010 release also revealed the content of the Senate Subcommittee's May 12, 2010 letter to defendant Yarmuth. The letter, a true and correct copy of which is attached hereto as Exhibit A, stated, in pertinent part:

From 2000 through 2007, under the Medicare home health prospective payment system (PPS), home health agencies received an additional $2,200 in addition to the base reimbursement rate when HHAs made over nine therapy visits. During this period, the *Wall Street Journal*, reported that the number of patients a certain home health company visited 10 times was three times higher than the number of beneficiaries visited nine times. In fact, a former employee of this home health company stated that she had to "have ten visits to get paid" and "the tenth visit was not always medically necessary."

- 23 -

Starting in 2008, CMS revised home health PPS rules to provide additional payments at six, 14, and 20 therapy visits. These additional payments also became graduated within these intervals. The home health industry apparently changed their utilization patterns as a result of these payment policy changes. In March 2010, the Medicare Payment Advisory Commission (MedPAC) found:

> In 2008, the share of therapy episodes with decreased payments under the new system – those in the range of 10 to 13 therapy visits – dropped by about one third. . . .  Conversely, volume increased for therapy episodes that have higher payment under the revisions. For example, in 2008 payment episodes with six to nine visits increased by 30 percent, and the share of the these episodes increased from 9 percent to 12 percent. At the higher end of the visit distribution, payment for episodes with 14 or more therapy visits increased by 26 percent, and the share of these episodes increased from 12 percent to 15 percent. The immediate change in utilization demonstrates that home health providers can quickly adjust services to payment changes in the therapy visit thresholds.

> According to an analysis by the *Wall Street Journal*, therapy visits by one of the leading home health companies followed these shifts. Apparently, the percentage of patients getting 10 therapy visits from one home health company dropped by 64 percent in 2008 from 2007. Also, the percentage of "patients of another home health company getting 10 visits dropped by 50 percent, while the percentage that got six visits increased 8 percent. The percentage of patients getting 14 visits rose 33 percent and the percentage getting 20 visits increased 41 percent."

> The findings reported in the *Wall Street Journal* article are of great concern to us, especially since they appear to be confirmed by MedPAC's research. These findings suggest that HHAs are basing the number of therapy visits they provide on how much Medicare will pay them instead of what is in the best interests of patients.

50.     The May 12, 2010 letter requested that the Company produce substantial amounts of data covering each year from 2006 through 2009, and instructed the Company to respond by June 2, 2010.

51.     On May 13, 2010, *The Wall Street Journal* published an article detailing the Senate Committee's investigation of Almost Family and three of its competitors, Amedisys, LHC and Gentiva, for their Medicare billing practices.  The article disclosed, in pertinent part, as follows:

> The Senate Finance Committee launched an investigation into the practices of Amedisys Inc., the nation's largest home health-care company, and three other companies that provide in-home therapy visits reimbursed by Medicare.

- 24 -

The committee is investigating whether the companies deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements.

A Wall Street Journal article last month described how the companies' Medicare patients received a high number of the most profitable therapy visits, but few of the least profitable ones.

The three other home health companies are LHC Group Inc., Gentiva Health Services Inc. and Almost Family Inc.

Companies "working with Medicare should not be allowed to target seniors or manipulate care simply to get higher reimbursement rates," said Sen. Max Baucus (D., Mont.), chairman of the finance committee, in a statement.

"It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both," said Sen. Charles Grassley, (R., Iowa), ranking member of the committee. "We're working to figure out what's going on."

The home therapy numbers cited in the article, which came from publicly available Medicare claims, "suggest home health agencies intentionally increased utilization for the purpose of triggering higher reimbursements," the senators wrote in letters that were emailed Wednesday to the chief executives of the four companies.

Almost Family didn't provide comment. Representatives for LHC, Gentiva and Amedisys said they would cooperate with the probe.

The inquiry letters ask each CEO to provide information on their companies' therapy visits from 2006 through 2009 and about financial relationships with referring physicians.

52.     Also on May 13, 2010, Almost Family issued a press release in response to the U.S.

Senate Finance Committee investigation.  The Company stated as follows:

Almost Family, Inc., a leading regional provider of home health nursing services, has received an inquiry letter from the U.S. Senate Finance Committee regarding an article in the April 26, 2010 edition of *The Wall Street Journal*. The Company intends to cooperate fully with the Committee's request for information related to the Company's historical home health operations.

William Yarmuth, President and CEO of Almost Family, Inc., said, "We intend to fully cooperate with the Committee's request for information. Our Senior Advocacy mission calls for our caregivers to provide care based solely on patients' needs and clinical conditions and we are confident that when our data is thoroughly reviewed, it will provide a much clearer picture than was portrayed in *The Wall Street Journal* article."

- 25 -

53.     In response to the Company's press release and the revelation of the Senate Committee's investigation into the Company's practices, Almost Family common stock dropped $3.22 per share, or 7.56%, on a 459% increase in trading volume, to close at $39.37 per share on May 13, 2010. But for defendants' false and misleading statements, the stock would have dropped further.

54.     Finally, on July 1, 2010, the Company issued a press release revealing that Almost Family was under investigation by the SEC, and that the SEC had issued a civil subpoena for documents. The Company stated as follows:

> Almost Family, Inc., a leading regional provider of home health nursing services, announced today that on June 30, 2010 it received a civil subpoena for documents and notice of investigation from the Securities and Exchange Commission. The subpoena seeks documents related to the Company's home health care services and operations, including reimbursements under the Medicare home health prospective payment system, since January 1, 2000. The Company will supply the requested documents and cooperate fully with the SEC regarding the document request.
>
> William Yarmuth, President and CEO of Almost Family, Inc., said, "Following an article on home health care in the April 27, 2010 edition of *The Wall Street Journal*, the U.S. Senate Finance Committee requested information from all of the publicly traded companies mentioned in that article. We have been cooperating fully with the Senate Finance Committee, and we will do the same with the SEC."

55.     Also on July 1, 2010, the *Dow Jones Business News* published an article, "SEC Probes Home-Health-Care Firms' Reimbursements," discussing the SEC's investigation into Almost Family. The article disclosed the following relevant information:

> Home-health-care providers Amedisys Inc. (AMED) and Almost Family Inc. (AFAM) are being investigated by the Securities and Exchange Commission, a month and a half after the U.S. Senate began inquiring into their Medicare-reimbursement practices.
>
> The investigations revolve around whether the companies pushed patients into extra, sometimes unnecessary, home-health care visits in order to hit a threshold level that secured them thousands more in reimbursements from the government's health-care program.

That practice, which the companies say wasn't nefarious, was earlier brought to light by a Wall Street Journal article in April and followed up weeks later by requests from the U.S. Senate Finance Committee. Amedisys and Almost Family both said they will be cooperating with the SEC probe.

Two other peers, Gentiva Health Services Inc. (GTIV) and LHC Group (LHCG), were both involved in the Senate inquiry, but said they aren't under SEC investigation.

LHC spokesman Eric Elliott told Dow Jones Newswires the company hasn't "received anything or had any contact with SEC." And Gentiva put out a statement saying it hasn't received notice of formal investigation or received a subpoena.

An SEC spokesman declined to comment about any investigations.

The shares of each dropped sharply in a broadly lower market Thursday, though some analysts rushed to say, as they had last month, that the companies will ultimately be cleared. Still, the SEC's move appeared to raise more questions as it was an agency some weren't expecting to get involved, and led to concerns other government inquiries may be in the works.

Shares of Amedisys, the nation's largest home health-care company, slumped 14% to $37.87, while Almost Family slid 11% to $31.12. Gentiva was down 13% to $23.50 and LHC lost 10% to $24.91. The volumes on each were at least twice the average, while Amedisys was trading on eight times its typical volume.

The Senate had said it was focusing on whether the companies used extra visits, to get to 10 visits per patient, a level that would secure an additional $2,200 reimbursement from the government-run health-care program under a prior reimbursement schedule. When the rules were changed in 2008 to eliminate the $2,200 extra bonus in favor of incremental bonuses, a Wall Street Journal analysis found fewer patients were getting 10 visits.

The companies have said they were complying with Medicare requests by switching the practices, not using medically unnecessary visits simply for extra payouts.

56.     On July 1, 2010, after the SEC investigation was disclosed to the market, Almost

Family's stock plummeted $3.88 per share, or 11.11%, reaching a low of $29.25 per share, on an

increase of 285% in trading volume, ultimately closing at $31.05 per share.

57.     The true facts, which were known by or available to the defendants during the Class

Period, which rendered defendants' statements above materially false and misleading, were: (a) that

the Company's reported sales and earnings growth was materially impacted by a scheme whereby

the Company intentionally increased the number of in-home therapy visits to patients for the purpose of triggering higher reimbursement rates under the Medicare home health prospective payment system, as those excess visits were not always medically necessary; (b) that the Company's reported sales and earnings were artificially inflated by the scheme and subject to recoupment by Medicare; (c) that the Company was in material violation of its Code of Ethics & Business Conduct due to the scheme to inflate Medicare revenues; and (d) that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company, its prospects, financial performance and growth.

58.     The market for Almost Family common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Almost Family common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Almost Family common stock relying upon the integrity of the market price of Almost Family common stock and market information relating to Almost Family, and have been damaged thereby.

59.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Almost Family common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

60.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiff and other members of the Class.  As described herein, during the

Class Period, defendants made or caused to be made a series of materially false or misleading statements about Almost Family's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Almost Family and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### ADDITIONAL SCIENTER ALLEGATIONS

61.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Almost Family, their control over, and/or receipt and/or modification of Almost Family's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Almost Family, participated in the fraudulent scheme alleged herein.

### LOSS CAUSATION/ECONOMIC LOSS

62.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Almost Family common stock and operated as a fraud or deceit on Class Period purchasers of Almost Family common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  When

defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Almost Family common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Almost Family common stock during the Class Period, plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

63.     By failing to disclose to investors the adverse facts detailed herein, defendants presented a misleading picture of Almost Family's business and prospects. Defendants' false and misleading statements had the intended effect and caused Almost Family common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $44.12 per share on April 29, 2010.

64.     As a direct result of the disclosures in the April 26, 2010 *Wall Street Journal* article, the May 13, 2010 Senate Committee disclosures and the announcement of the SEC investigation on July 1, 2010, Almost Family common stock fell precipitously. These drops removed the artificial inflation from the price of Almost Family common stock, causing real economic loss to investors who had purchased Almost Family common stock during the Class Period.

65.     The declines were a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines in Almost Family common stock negates any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Almost Family common stock and the

subsequent significant declines in the value of Almost Family common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET DOCTRINE

66.   At all relevant times, the market for Almost Family common stock was an efficient market for the following reasons, among others:

(a)   Almost Family common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, Almost Family filed periodic public reports with the SEC and the NASDAQ;

(c)   Almost Family regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Almost Family was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

67.   As a result of the foregoing, the market for Almost Family common stock promptly digested current information regarding Almost Family from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Almost Family common stock during the Class Period suffered similar injury through their purchase of Almost Family common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

68.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Almost Family who knew that those statements were false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements

made not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

72.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Almost Family common stock.  Plaintiff and the Class would not have purchased Almost Family common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

73.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Almost Family common stock during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against All Defendants

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     The Individual Defendants acted as controlling persons of Almost Family within the meaning of §20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Almost Family, and their ownership of Almost Family stock, the Individual Defendants had the power and authority to cause Almost Family to engage in the wrongful conduct complained of herein.  The Company controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead

Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil

Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 2, 2010                    THOMAS R. KERR, KBA #38250


                                          /s/ Thomas R. Kerr
                                          THOMAS R. KERR

                                          732 Scott Street
                                          Covington, KY  41011
                                          Telephone: 859/431-2222

                                          ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          DAVID J. GEORGE
                                          120 E. Palmetto Park Road, Suite 500
                                          Boca Raton, FL  33432
                                          Telephone:  561/750-3000
                                          561/750-3364 (fax)

- 34 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
DAVID C. WALTON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CptDraft\Securities\Cpt Almost Family.doc