UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:10-CV-00520-H

IN RE ALMOST FAMILY, INC.
SECURITIES LITIGATION

**MEMORANDUM OPINION**

Plaintiffs' Consolidated Class Complaint alleges that Defendants, Almost Family, Inc. and its senior executives ("Individual Defendants") (collectively, "Almost Family"), defrauded the Proposed Class in violation of federal securities laws. Lead Plaintiff, the Connecticut Laborers' Pension Fund, moved for and was granted consolidation of related actions against Defendants pursuant to § 21D(a)(3)(B) of the Securities Exchange Act of 1934 as amended by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4(a)(3)(B).

Defendants have moved to dismiss on the grounds that Plaintiffs' Complaint fails to state a claim. In a recent conference with the Court, the parties thoroughly discussed the pending motion and re-enforced their best arguments. The analysis that follows focuses upon whether Plaintiffs' complaint sufficiently pleads two important elements of such a claim: a material misrepresentation and loss causation. Plaintiffs must succeed on both elements. After thorough consideration of the parties' arguments both made during the conference and presented in their briefs, the Court concludes that Plaintiffs succeed on neither and will sustain Defendants' motion to dismiss.

**I.**

Almost Family provides in-home health care services to patients participating in the federal government's Medicare program. Defendant William Yarmuth has been Chairman of the

board of directors and Chief Executive Officer of Almost Family since 1992.  Before that, he

was President and Chief Operating Officer and a director of the company.  Defendant C. Steven

Guenthner has been Senior Vice President and Chief Financial Officer of Almost Family since

1992, and he also serves as Corporate Secretary.

Almost Family receives a significant portion of its revenues from Medicare payments and

reimbursements for care of eligible patients as a service provider for Medicare's Home Health

Care Program ("HHCP").  The HHCP, acting through Home Healthcare Agencies ("HHAs"),

such as Defendants, pays for nurses, home health aides, and therapists to treat homebound

patients. Medicare reimbursements for HHAs like Almost Family depend heavily upon the

number of therapy visits provided to patients within certain periods of time, deemed "episodes."

This case arises from a change in Medicare regulations pertaining to home health care

services.  Prior to 2008, providers of home health care services received larger reimbursement

once a patient received ten or more therapy visits (such as physical or rehabilitative therapy)

during a 60-day treatment episode.  In 2008, Medicare modified its payment thresholds to six,

fourteen, and twenty visits.  The revised schedule established increases in payments at these

three thresholds, in stark contrast to the one present under the former guidelines.

Prior to 2008, a high percentage of Almost Family's patients received ten or slightly

more than ten therapy visits within 60-day treatment episodes.  For example, almost 25% of

Defendants' patients received ten therapy visits in 2007.  Following the adoption of Medicare's

new payment schedule, the number of patients receiving ten therapy visits significantly

decreased, and the number of patients receiving visits closer to the new thresholds increased.

Plaintiffs also reference statements of three confidential witnesses from local offices who

provided anecdotal evidence that superiors directed them to manipulate the number of patient office visits by wrongfully obtaining medical referrals or providing unnecessary care to patients.[1]

On April 27, 2010, the *Wall Street Journal* ("WSJ") published a story analyzing the number of home therapy visits provided by several HHAs. The article statistically analyzed publicly available data from these HHAs, revealing a noticeable difference in the number of therapy visits provided to patients prior to and after Medicare's 2008 reimbursement-rate modifications. The article suggested that HHAs, driven by desire to increase payments from Medicare, rather than patients' medical needs, purposefully altered their practices following the 2008 changes. The article did not focus on Almost Family, but mentioned it briefly.

Shortly thereafter, on May 12, 2010, Defendant Guenthner sold 20,000 Almost Family shares, approximately 12% of his holding. The next day, the United States Senate Finance Committee announced that it was investigating allegations that Almost Family and others had abused Medicare's payment system. On July 1, 2010, the Securities and Exchange Commission ("SEC") also announced it would investigate Defendants and others regarding their Medicare billing practices. As these publications and announcements surfaced, Defendants released statements and commented on the pending investigations, denying any misconduct and agreeing to cooperate fully with investigators.

Based on these publications and subsequent comments, which Plaintiffs assert constituted disclosures of fraud, this action followed.

## II.

---

[1] This must involve a complex series of events because Almost Family personnel have no direct ability to manipulate or increase treatment. Almost Family facilities provide medical care only pursuant to the order of physicians who are independent of the company.

3

Section 10(b) of the Securities Exchange Act and Rule 10b-5, promulgated thereunder, prohibit fraudulent, material misrepresentations in relation to the sale or purchase of securities. *Indiana State Dist. Council of Laborers and Hod Carriers Pension and Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009) (internal quotation marks and citations omitted). To succeed on a private cause of action for violations thereof, a plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.* (quoting *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Defendants argue that Plaintiffs' claims should be dismissed for failure to adequately plead materiality, scienter, reliance, economic loss, and loss causation. A Rule 12(b)(6) motion to dismiss will be granted if it appears beyond doubt that the claimant can prove no set of facts supporting its claim which would entitle it to relief. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 249-50 (1989). Satisfying this standard "requires more than bare assertions of legal conclusions." *In re Humana, Inc. Sec. Litig.*, No. 3:08-CV-00162-JHM, 2009 WL 1767193, at *6 (W.D. Ky. June 23, 2009). When considering a Rule 12(b)(6) motion to dismiss, the Court assumes as true all well-pleaded facts within the complaint and draws all reasonable inferences in the favor of the non-moving party. *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997). In the sections that follow, the Court will focus its analysis on whether Plaintiffs have inadequately pled materiality and loss causation.

4

### III.

To recover under Section 10(b) and Rule 10b-5, "a plaintiff must show both an omission or misstatement and its materiality." *Omnicare*, 583 F.3d at 943. "Materiality can be established by proof of a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id*. (internal quotations marks and citation omitted). After all, "[w]hen a company chooses to speak, it must 'provide complete and non-misleading information.'" *Id*. (citation omitted). Nonetheless, "liability does not attach to mere corporate puffery or statements of corporate optimism." *Id*. (citation omitted).

### A.

The Sixth Circuit discussed the materiality requirement thoroughly in *In re Sofamor Danek Group, Inc.*, 123 F.3d 394. This analysis answers important questions for our case and it serves as a basis for this Court's consideration.

Sofamor was a medical technology manufacturing company which generated substantial portions of its revenues by providing a spinal fusion device to surgeons who used it in a manner unapproved by the Food and Drug Administration (the "FDA"). *Id*. at 397-98. Plaintiffs alleged that Sofamor's reported earnings and statements were "misleading because they attributed the company's success to such things as increased sales volume without properly explaining how the sales were being achieved." *Id*. at 400. Plaintiffs argued that Sofamor did not disclose that its success was due to the promotion of its spinal fusion device for purposes not approved by the FDA. In fact, the defendants expressly disavowed any knowledge of wrongful promotion and "downplayed any positive financial effects from loaner sales" related to these devices. *Id*.

5

(internal quotation marks omitted).

The Sixth Circuit observed that the "sales and earnings data publicly reported by Sofamor Danek" were "'hard' numbers, the accuracy of which ha[d] never been challenged by the plaintiffs." *Id*. As the court explained, "[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Id.* at n. 3. Furthermore, the plaintiffs had never "pointed to any affirmative misstatement in the company's explanations of the numbers." *Id*. at 401. As to the hard numbers, this presents exactly the circumstance as Almost Family's earnings figures in our case.

The Sixth Circuit also discussed the difference between so-called "hard" facts and "soft" information for purposes of disclosure in the context of analyzing materiality. "'[S]oft' information, which includes predictions and matters of opinion . . ." must only be disclosed if it is "virtually as certain as hard facts." *Id*. (quoting *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985)). The court concluded that whether Sofamor's promotion techniques were "legal" was a matter of opinion and thus constituted "soft" information. *Id.* Sofamor was not required to disclose a particular prediction or opinion about possible FDA regulation or action beyond providing notification to their investors that the risk existed. *Id.*

The Sixth Circuit has continued to apply the "hard" and "soft" information distinction, holding that "statements regarding 'legal compliance' are not actionable because companies have no duty to opine about the legality of their own actions." *Omnicare*, 583 F.3d at 945. *See also Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008). Consequently, as a general rule a defendant has no liability under Section 10(b) or Rule 10b-5 for making "general statements that it complied with state law and regulations and had a policy of

6

complying with the law." *Omnicare*, 583 F.3d at 945. Where a plaintiff alleges that a defendant's claim of legal compliance "was made with knowledge of its falsity," yet offers "few factual allegations" in support of its claim, materiality is insufficiently pled. *Id.* at 945-46.

B.

Plaintiffs' allegations here track those found insufficient in *Sofamor*. Plaintiffs point to the following statements containing material misrepresentations: (1) a total of fifteen quarterly and annual financial reports submitted by Defendants to the SEC during the Class Period affirming that Defendants were abiding by securities laws and Medicare regulations; and (2) a series of statements issued by Individual Defendants following publication of the WSJ article and news of investigations into Defendants.[2]

The Court will discuss each of these assertions and place each within the context of the relevant case law. In the Court's view, Plaintiffs either refuse to acknowledge the "hadd/soft" information distinction or fail to explain how the cited statements constitute hard information.

1.

To the extent Defendants' quarterly and annual financials merely reported on the financial condition of Almost Family, they constitute "hard" information because they contain "factual information that is objectively verifiable." *Sofamor*, 123 F.3d at 401 (quoting *Garcia v. Cordova*, 930 F.2d 826, 830 (10th Cir.). Plaintiffs do not specifically allege that the financials themselves were substantively inaccurate.[3] Consistent with the Sixth Circuit's explanation in

---

[2] In support of these allegations, Plaintiffs rely heavily on the report of Dr. Dove, an expert consultant hired by Plaintiffs to perform statistical analyses on data of Almost Family's therapy visits before and after the 2008 Medicare reimbursement amendments.

[3] Plaintiffs contend that their allegations challenge the accuracy of the data within Almost Family's financial reportings, but the Amended Complaint fails to do so. Rather, Plaintiffs merely argue that Defendants "materially overstated financial results, such as income and revenue figures," yet provide no support by way of specific factual

*Sofamor*, such "hard" information, when accurate, cannot serve as the premise for a violation of federal securities law. Thus, Plaintiffs have not established that Defendants' quarterly and annual financial reportings constitute material misrepresentations.

Plaintiffs also allege that the Individual Defendants' signatures on Almost Family's SEC filings, certifying that, to their knowledge, their reports and filings did not contain untrue statements or omissions of material facts, constitute material misrepresentations. This argument is merely an attempted "end run" around the "hard/soft" information distinction. The certifications assert nothing more than Individual Defendants' beliefs that their financial reports were accurate and the opinion that their actions in no way violated federal securities laws or other regulations governing Almost Family. Under *Sofamor,* these statements constitute "soft" information. For this reason, the Court concludes that none of the certifications constitute material misrepresentations.

2.

Next, Plaintiffs allege that following publication of the WSJ article, Defendant Guenthner denied that Almost Family had violated Medicare billing regulations. Guenthner explained that Medicare had created incentives for HHAs to alter their practices by creating a monetary bonus for patients reaching ten visits. In turn, Guenthner suggested that this encouraged HHAs to seek out patients with specific types of injuries.

Plaintiffs fail to allege how this statement was materially misleading, stating only that

---

allegations. The factual allegations of the Amended Complaint focus only on the ways in which Almost Family generated revenues and reimbursements, not that the actual data they reported was false. This demonstrates the distinction between "soft" and "hard" information– the latter, when accurate, cannot serve as the basis of a securities fraud cause of action. The Court thus analyzes Plaintiffs' allegations as "soft" information for the purposes of pleading a material misrepresentation.

"the statements falsely represented that Almost Family sought out patients that required specific numbers of visits when, in fact, Almost Family did not discriminate between patients based on their required levels of treatment." A careful reading of Guenthner's statement reveals it to be a reflection and opinion about the possible impact of Medicare's reimbursement amendments on HHAs, and their perhaps unintended consequences. However, it is a far cry to deem these comments as material misrepresentations sufficient to sustain a cause of action for securities fraud.

3.

In addition, Plaintiffs allege that Chairman Yarmuth offered comments following the publication of the WSJ article that constituted material misrepresentations. During a public conference call with analysts, Yarmuth stated:

> So we were taking care of a lot of different people in 2008 than we were taking care of in 2007 who had different medical conditions and different clinical needs and different needs to have levels of service. And we, as we always do, go about trying to provide the care that the patient needs based up on their clinical condition. And I think that in some ways, the industry responded to what the government wanted the industry to do, and I think there are people that are being cared for now that maybe weren't being cared for before, and that's a good thing. And there's more people that are being cared for now than there were before, and that's a good thing. And I think the narrow focus on the ten visits doesn't really get to the point of why the reimbursement system was changed. And clearly, once again in this article between 2007 and 2008 for us, we took care of a lot of different types of patients.
>
> So I think there were some implications in the article that were not necessarily – that weren't necessarily true, and I think if you really look at the article, you'll see that what happened has happened over the history of healthcare, Medicare healthcare as we've observed. The federal government decides that they want – they create the reimbursement system to achieve certain objectives, and providers typically respond to those objectives that the government creates the reimbursement system

9

for; i.e., DRG. When the hospitals put the DRG system back in the 80s,
length of stays declined, and that's pretty simple. And I think really what
we did in this article, I don't think that the article said this, but I think our
position is the government wanted to create a greater distribution of care
across a broader base of people who are in need, and the industry
responded.

According to Plaintiffs, Yarmuth falsely represented that (1) the WSJ article had "serious flaws"

and contained "implications that weren't necessarily true;" and that (2) Almost Family accepted

different types of patients in 2008 than in 2007 and that its treatment was based on "trying to

provide the care that the patient needs based on their clinical condition."

Although the Court cannot determine whether these statements were false, it can

determine that if false, they were not material.  In context, Yarmuth's comments amount to mere

opinions and reflections on the WSJ article itself and the Medicare reimbursement scheme.  They

do not assert any "soft" information that could reasonably be read as facts. Yarmuth was

justifying and defending the legality of Almost Family's actions following the Medicare

amendments.  His comments were an attempt to explain how the contrasting data from 2007 and

2008 could be explained independent of any wrongdoing.  Thus, Yarmuth's comments were

aimed at defending the legality of Almost Family's practices and constituted "soft" information.

4.

On May 13, 2010, Almost Family issued a press release, announcing its receipt of an

inquiry letter from the Senate Finance Committee.  Defendants explained that, in light of the

WSJ article, the Senate Finance Committee requested information relating to Almost Family's

operations.  The press release quoted Yarmuth saying: "We intend to fully cooperate with the

Committee's request for information.  Our . . . mission calls for our caregivers to provide care

based solely on patients' needs and clinical conditions and we are confident that when our data is

10

thoroughly reviewed, it will provide a much clearer picture than was portrayed in the [WSJ] article."  Plaintiffs cite the press release as an additional material misrepresentation, primarily pointing to Yarmuth's quoted response.

Reading his comment in context of the entire press release, it is unmistakable that Yarmuth was simply defending the company's actions as lawful and compliant with regulations. Because the WSJ suggested that HHAs may not have been providing care based upon patient needs, which would run afoul Medicare regulations, Yarmuth's defense of the company's position was an opinion in light of the Senate Finance Committee's pending inquiry.  Placed in the appropriate context, Yarmuth's comments do not amount to material misrepresentations.

5.

Finally, Plaintiffs allege that Yarmuth's remarks during a May 18, 2010 conference presentation constitute material misrepresentations.  Yarmuth remarked on a number of issues relating to Almost Family's strategy, success, and management.  Yarmuth claimed that Almost Family's strategy was to "educat[e] and train[] [their] clinicians," and he attributed the company's success to strong senior management, some of which had worked together for decades.  Yarmuth also praised Almost Family's geographic concentration of operations. Plaintiffs argue that these comments constitute material misrepresentations because Almost Family's growth was substantially due to its scheme to manipulate Medicare's reimbursement system, rather than the explanations offered by Yarmuth.

To establish these statements as material misrepresentations, Plaintiffs must allege facts showing them to be false, not merely incomplete, information.  It is true, of course, that Almost Family's success could be attributed to several factors, and Plaintiffs have offered no evidence

11

suggesting that the factors discussed by Yarmuth were farcical.  Absent specifically alleging that the statements made by Yarmuth were false, Plaintiffs cannot successfully assert them to be material misrepresentations.

Upon reviewing each of the foregoing statements, the Court concludes that each constitutes soft information, which under current case law, cannot form the basis of a Section 10(b) and Rule 10b-5 claim.  To hold otherwise would dramatically expand the scope of general comments upon which companies could be liable under our securities laws.

**IV.**

The Court's inquiry does not end here.  Plaintiffs say that their Complaint can survive because they allege that the Individual Defendants actually knew that their statements about legal compliance were false.  Under this argument, the "soft" information distinction cannot absolve Defendants' statements from liability.

Plaintiffs are correct that a corporate officer must disclose even so-called "soft" information where a defendant's "knowledge of the illegality of [] allegedly unlawful conduct" imposes this duty of disclosure.  *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 708 (E.D. Mich. 2010).[4]  "Sufficient allegations of such 'knowledge' render [sic] 'soft' information more in the nature of a hard, objectively verifiable fact," and therefore subject to disclosure.  *Id.*  Plaintiffs rely upon four written statements of Almost Family employees to show precisely such knowledge.

A.

To invoke the duty of disclosure, a complaint must "adequately allege[] that the

---

[4] This formulation of the "soft" information requirement is consistent with the Sixth Circuit's more general statement.  *See Omnicare*, 583 F.3d at 945-946.

defendants knew of the illegal nature of their conduct at the time they made the allegedly material misstatement . . . ."  *Id*. at 707.  Therefore, "[a]bsent a clear allegation that the defendants knew of the scheme and its illegal nature at the time they stated the belief that the company was in compliance with the law, there is nothing further to disclose."  *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003).  Any plaintiff must plead actual knowledge on behalf of defendants, since "[t]he fact that a defendant's belief or opinion later 'prove[s] to be wrong in hindsight does not render the statements untrue when made.'" *Id*. (citation omitted).

The Sixth Circuit illustrated the duty to disclose "soft" information in *Zaluski v. United American Healthcare Corporation.*  527 F.3d at 573.  Relying on *City of Monroe Employees Retirement System*, the Circuit explained that a company has a duty to speak truthfully when its statements contradict information it possesses, such as those within its internal reports.  *Id*. (citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005)). *City of Monroe* involved allegations of securities fraud against a tire manufacturer regarding the safety of its products.  399 F.3d at 658.  Despite internal documents revealing firsthand knowledge of safety risks associated with its tires, the company and its executives, in several comments and press releases, continued to positively remark on the quality and safety of its products, and suppressed news of governmental investigations.  *Zaluski*, 527 F.3d at 573.  "The Court reasoned that, given that the [defendant's] press release was issued in response to several consumer lawsuits alleging product defects . . . , '[a] reasonable juror could . . . conclude that the statement, without some qualification or accompanying disclosure of the *numerous pieces of evidence that tended to cut the other way*, was a misrepresentation.'" *Id*. (citation omitted)

(emphasis added).

The importance of *Zaluski* and *City of Monroe* cannot be understated in context of our case. Both of these cases demonstrate the need for a plaintiff to specifically allege a defendant's actual knowledge of fraud or wrongdoing before a duty to disclose "soft" information can be invoked. More importantly, they provide a clear example of how this pleading requirement can be satisfied. Plaintiffs present several allegations of knowledge on behalf of Individual Defendants, primarily through the statements of Vickie LaMarche and Confidential Witnesses 1, 2, and 3 ("CW1", "CW2", and "CW3"). The Court will discuss each.

B.

CW1 asserts that a local office supervisor of Almost Family directed her to manipulate the number of visits provided to patients and further claims to have been terminated for failing to comply with this order. According to CW2, Medicare fraud at Almost Family was "definitely going on" and physical therapists were "pressured" to achieve certain numbers of visits. CW3 similarly alleges that nurses felt "pressured" to manipulate coding and alter treatment plans. Plaintiffs argue that these allegations corroborate Dr. Dove's statistical analysis and demonstrate that Almost Family was manipulating Medicare.

Vickie LaMarche is a former Executive Director of one of Almost Family's offices. In April of 2010, she wrote a lengthy letter, addressed to Defendant Yarmuth, offering and explaining her resignation. The letter focused on a myriad of challenges and frustrations she faced during her employment. She made general complaints of "unethical behavior bordering on what could be perceived as illegal business practices." In one paragraph of her five page letter, she claimed to have witnessed a fellow employee paying a doctor for medical referrals, forced

14

admissions of patients, and extended periods of time during which patients were being cared for and were seldomly, if ever, released from care. Like the Confidential Witnesses' allegations, LaMarche's letter focused only on local, intra-office issues in two offices.

Plaintiffs argue that LaMarche's letter, and statements by CW1, CW2, and CW3, demonstrate that Medicare fraud was rampant throughout Almost Family and, more importantly, that Individual Defendants were aware of it. Therefore, concludes Plaintiffs, Individual Defendants' actual knowledge that their own statements were false or misleading triggered a duty of disclosure for their "soft" statements. Defendants counter that none of Plaintiffs' allegations speak to the actual knowledge of Individual Defendants themselves. Stated another way, Plaintiffs, at best, have presented facts only alleging the possibility of fraud within Almost Family– not that Individual Defendants were aware of such behavior.

C.

The Court begins with two premises: (1) the pleadings must pass muster under the "actual knowledge" standard and (2) the pleadings must comply with heightened standards of the Private Securities Litigation Reform Act (the "PSLRA"), 15 U.S.C. § 78u-4(b)(1) and Rule 9(b) of the Federal Rules of Civil Procedure. The strict pleading requirements of the PSLRA require that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). And, Federal Rule of Civil Procedure 9(b) additionally requires that allegations of fraud "state with particularity the circumstances constituting fraud or mistake." These standards require significant specificity and particularity at

15

the pleading stage.

Perhaps the most obvious way Plaintiffs could adequately allege actual knowledge is by showing a direct information communicated by or to a defendant.  For example, as in *Zaluski*, a plaintiff could point to an internal memorandum that circulated to defendants, discussing or explaining alleged fraud.  Similarly, an informant could allege that a defendant acknowledged fraud to another person.  Such an allegation could create a sufficiently strong and direct inference in support of actual knowledge.  Moreover, the specific allegations of a company-wide policy implementing fraud may suffice to adequately suggest that a defendant would be directing, if not condoning, such acts.

Here, the Confidential Witnesses' allegations assert fraud vaguely, but do not present allegations that reflect on Individual Defendants themselves or their actual knowledge of any fraud occurring within Almost Family.  None of the Confidential Witnesses allege that Individual Defendants were either aware of (or should have been aware of) or in control of the supposed conduct.  All of the CW allegations fall short of implicating a company-wide fraudulent scheme, which might impute actual knowledge of Almost Family's fraud on Defendants.[5]  Together, the CW  allegations implicate only a few local offices.  None makes mention of such behavior being prevalent throughout the entire company.  None suggests the knowledge of Individual Defendants about these events.

---

[5]Even then, it is unclear whether Plaintiffs' burden would be met.  "Actual knowledge" is required to trigger a duty of disclosure regarding "soft" information, and Plaintiffs would therefore be required to plead, with specificity, that such pervasive fraud amounted to actual knowledge on behalf of Defendants.  *See Zaluski*, 527 F.3d at 572.  This issue does not prompt resolution now, however, because Plaintiffs fail even to present such allegations.

D.

Vickie LaMarche's statements are more specific and require further discussion. Her letter predominantly focuses on the conflict between LaMarche and a fellow colleague, which eventually erupted in a series of confrontational text messages. Only a small portion of the letter concerns fraud at two local offices.

LaMarche does not allege that any unethical or illegal behavior is pervasive within Almost Family and does not suggest that Individual Yarmuth was aware of any problems. The Court assumes that the letter made its way to Mr. Yarmuth's desk. However, the Court struggles to understand how a single letter from a former employee could somehow make Yarmuth aware that the entire company's financial results were inaccurate. After all, the crux of Plaintiffs' allegations are that Almost Family's financial reportings were fraudulent because of illegal medical and billing practices. LaMarche's letter fails to allege that fraud was widespread throughout the entire company or that such behavior was somehow known by Individual Defendants.

To allege the receipt of LaMarche's letter fails to allege with the specificity required by the PSLRA or the particularity required by Rule 9(b) that Individual Defendants had any actual knowledge of company-wide fraud. Absent such specificity, Plaintiffs cannot adequately plead that Individual Defendants were aware that their statements were misleading or false. The Court concludes that one letter by a former employee, airing her grievances about a handful of other employees, is insufficient to suggest that the top executives of a company were aware of rampant fraud. Thus, Defendants' statements remain "soft" information.

17

**V.**

The Court next discusses whether Plaintiffs have met their burden regarding loss causation.  In *Dura Pharmaceuticals, Inc. v. Broudo*, the United States Supreme Court defined loss causation as "a causal connection between the material misrepresentation and the loss."  544 U.S. 336, 342 (2005).  Relying upon "the common-law roots of the securities fraud action," namely tort law, the Supreme Court explained that liability for fraud attaches "when the facts . . . become generally known and as a result share value depreciates."  *Id.* at 344 (internal quotation marks and citation omitted).  To sufficiently plead loss causation, a complaint cannot simply allege that stocks were purchased at an "artificially inflated price."  *Durham v. Whitney Info. Network, Inc.*, No. 06-CV-00687, 2009 WL 3783375, at *19 (M.D. Fla. Nov. 10, 2009) (quoting *Dura Pharm.*, 544 U.S. at 347).  Rather, it must "demonstrate that the shares fell 'after the truth became known' with respect to the misrepresentations or omissions set forth . . . ."  *Id.*  "Stated another way, plaintiff[s] must establish a connection between a drop in stock price and the disclosure of the truth about [the Company's] previous misstatement or omission . . . ."  *Id.* (quoting *In re TECO Energy, Inc. Sec. Litig.*, No. 8:04-CV-1948-T-27EAJ, 2006 WL 845161, at *2 (M.D. Fla. Mar. 30, 2006)) (internal quotation marks and brackets omitted).

Although *Dura Pharmaceuticals* provided significant guidance for evaluating the sufficiency of loss causation pleadings, its progeny have shown that some novel questions are largely unanswered.  Namely, the question of whether and to what extent fraud must become known by the market before it can sufficiently be pled as causally related to economic loss remains unsettled.  Because the case now before the Court demands a direct answer to this question, the Court has carefully considered this issue and now applies currently available case

18

law.

A.

The Court begins with the basic question of whether a pleading of loss causation must include the revelation of fraud. Plaintiffs argue that a revelation of fraud is not required to adequately plead loss causation. Instead, they say that loss causation may either be pled by showing that losses resulted from the materialization of a risk that was concealed by fraud.[6] Although the Court agrees that disclosures, and more particularly, *partial* disclosures, may suffice in some cases to establish loss causation, the requirement of revealing fraud is not lost.

"In a typical Rule 10b–5 case, the plaintiff buys stock at a price that he claims was inflated by misrepresentations by the corporation's management and sells his stock at a loss when the truth *comes out* and the price plummets." *Stark Trading v. Falconbridge Ltd.*, 552 F.3d 568, 571 (7th Cir. 2009) (emphasis added). The Supreme Court has said that a party becomes liable for its fraud only after the misrepresentation or omission becomes "generally known" and "as a result share value depreciates." *Dura Pharm.*, 544 U.S. at 344 (internal quotation marks and citation omitted).[7] *Dura Pharmaceuticals* further emphasizes securities laws and private

---

[6] Plaintiffs press the Court to adopt rulings by the Second Circuit, as articulated in *Lentell v. Merrill Lynch & Co.*, which purport to reject the notion that fraud must be revealed to the market before it can be deemed to cause losses. 396 F.3d 161, 175 (2d Cir. 2005). The Court has carefully considered *Lentell* and is satisfied that the Second Circuit seemingly recognizes that, at the very least, fraud must be uncovered, and responded to by the market, before loss causation can be established. *Id.* ("There is no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of [Defendant's] . . . recommendations." *Id.* "These allegations do not amount to a corrective disclosure . . . because they do not *reveal* to the market the falsity of the prior recommendations." *Id.* at n. 4. (emphasis added). "[Defendant's] concealed opinions . . . could not have caused a decrease in the value of those companies before the concealment was made public." *Id.*). Although the Second Circuit's view of loss causation focuses on "the relationship between the plaintiff's investment loss and the information misstated or concealed by the defendant," its analysis appears to contemporaneously contemplate that such misstatements must be revealed to and responded to by the market before loss causation can be established. *Id.* at 174.

[7] Without a revelation, one can only assume that other factors or speculation about unrevealed matters have caused the decline in stock value (such as external business conditions) *Id.* at 344-45.

19

securities fraud actions are intended to "maintain public confidence" in the market by protecting investors "against those economic losses that misrepresentations *actually* cause." *Id*. at 345 (citation omitted) (emphasis added).  To achieve this goal, private actions must be based upon actual fraud or wrongdoing and can ripen only after a defendant's misrepresentation or omission becomes generally known to the market.  Otherwise, such lawsuits will serve as no more than "broad insurance against market losses." *Id*.  The Court's first and most difficult question to answer is when such truth surfaces.

This is a challenging task.

The Court looks to post-*Dura Pharmaceuticals* circuit court analyses for guidance.  The Court finds only one unpublished case in which the Sixth Circuit has extensively reflected on *Dura Pharmaceuticals* and applied its loss causation principles. *D.E.&J. Limited Partnership v. Conaway*, 133 F. App'x 994, 1000 (6th Cir. 2005).  There, investors brought putative securities fraud class actions against senior executives of Kmart Corporation, alleging that the company's brief financial success following the appointment of new leadership was attributable to accounting fraud. *Id*. at 996.  Among other maneuvers, the accused Kmart executives concealed the company's financial difficulties by reporting rebates in its interim financial statements that the company had hoped to earn by the end of year. *Id*.  The complaint alleged that Kmart's fraud was revealed, and the market negatively responded, when the company announced that it had filed for reorganization under Chapter 11 and when it restated its financial statements. *Id*. at 1000.  The Sixth Circuit held that neither of these allegations identified specific economic loss or the causal connection between such a loss and the company's misrepresentation. *Id*.  Relying on the loss causation analysis set forth in *Dura Pharmaceuticals*, the court concluded that the

20

plaintiffs had "done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgment of prior misrepresentations caused that drop." *Id*.

More recently, other circuits have adopted similar views of *Dura Pharmaceuticals*' loss causation principles. In *Metzler v. Corinthian Colleges*, plaintiffs alleged that Corinthian colleges were "pervaded by fraudulent practices designed to maximize the amount of federal Title IV funding– a major source of Corinthian's revenue– that those schools receive[d]." 540 F.3d 1049, 1055 (9th Cir. 2008). These practices included, among others: "falsifying financial aid applications to obtain federal funds and increase federal award entitlements; encouraging students to falsify federal student aid forms themselves; manipulating student enrollment by counting students not yet enrolled (referred to in the [Complaint] as "false starts"); [and] manipulating or falsifying student grades to maintain federal funding eligibility." *Id.* at 1062. Guided by *Dura Pharmaceuticals*, the Ninth Circuit held that while plaintiffs are "not required to show that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation," they "must, however, set forth allegations that if assumed true, are sufficient to provide the defendant with some indication that the drop in defendant's stock price was causally related to [the defendant's] financial misstatement[s]." *Id.* at 1062 (emphasis in original) (citation, internal quotation marks, and brackets omitted). Thus, for example, a plaintiff does not adequately plead loss causation for the drop in defendant's in a defendant's stock that occurs *prior* to the actual revelation of fraud. *Id.* (quoting *In re Daou Systems*, 411 F.3d 1006, 1027 (9th Cir. 2005) (emphasis added)).

Similarly, in *In re Daou*, the Ninth Circuit carefully delineated "between losses caused

21

after the company's conduct was revealed, and losses suffered before the revelation," confirming "that the complaint must allege that the practices [] the plaintiff contends are fraudulent were *revealed to the market* and caused the resulting loss." 411 F.3d at 1063 (emphasis added). Citing similar holdings by the Fourth and Seventh Circuits, the Ninth Circuit concluded that disclosure of fraud should "reveal widespread financial aid manipulation," which could be accomplished by a single or multiple disclosures. *Id.* at 1063. In any event, loss causation is not sufficiently pled "where a defendant's disclosure reveals a 'risk' or 'potential' for widespread fraudulent conduct." *Id.* at 1064.

Relying on these circuit court analyses, this Court concludes that Plaintiffs must show some revelation of Defendants' fraud– that they performed unnecessary procedures or provided unnecessary services to patients which ultimately inflated their earnings and stock value– in order to satisfy the pleading requirements of loss causation. The disclosures must amount to more than revelations of *possible risks* that Defendants were engaged in such prohibited practices.

Requiring that fraud be revealed or disclosed to the market in order to adequately plead loss causation is both sensible and efficient. If the purpose of the loss causation requirement is to ensure that an investor's loss is *actually* caused by a defendant's fraud, and not an unrelated circumstance in the market, then a plaintiff cannot satisfy her pleading requirements while the fraud remains concealed from the market. Stated another way, the market cannot respond to fraud until it has been revealed. If the disclosure of a mere *risk* of fraud was enough to trigger loss causation, a private cause of action for securities fraud would accrue every time an allegation or rumor of wrongdoing circulated.

Allowing investors to pursue a claim which essentially eliminates any investment risk factor–which lies at the heart of these transactions–is not the purpose of Section 10(b) and Rule 10b-5. Investors purchase stocks well aware of, and in fact motivated by, the risks associated with the market. If no risk existed in these transactions, the market as we know it would cease to exist. Thus, insuring against the mere *risk* or *possibility* of fraud for these investors is a job outside the purview of securities laws, which are designed not to serve as broad insurance policies for investors against losses generally, but rather as protection against only those losses directly attributable to fraud. Perhaps Judge Richard Posner of the Seventh Circuit stated it best: "No social purpose would be served by encouraging everyone who suffers an investment loss because of an unanticipated change in market conditions to pick through . . . memoranda with a fine-tooth comb in the hope of uncovering a misrepresentation." *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir. 1990). In a nutshell, Judge Posner articulates the practical reason for the loss causation requirement.

### B.

Here, Plaintiffs first argue that the WSJ article constituted a partial disclosure of Defendants' misrepresentations. In support of this argument, Plaintiffs cite to *In re America Service Group, Inc.*, where a New York Times article did suffice as a disclosure of fraud. There, however, the article revealed the "culprit" behind a scheme investigated by the New York Times. After a year-long examination, the newspaper presented its findings, which were wholly unknown to the public, in an article focused solely on the defendant in the case. Based on this article, the Middle District of Tennessee concluded that plaintiffs sufficiently established a disclosure for purposes of pleading loss causation.

23

The WSJ article here differs dramatically from the New York Times article at issue in the *America Service Group* case.  First, the WSJ article focuses primarily on another healthcare company and Defendants are mentioned only once, briefly, throughout the entire text.  Second, the reference to Defendants presents no specific allegation of fraud.  The article does not allege that Defendants falsely reported artificial profits or otherwise communicated prior misrepresentations.  Finally, and perhaps most noteworthy, the article presented no *new* information to the market.  The article was based on a statistical analysis of financial statements and records already available to the public.[8]  For all these reasons, the Court is satisfied that the WSJ articles does not constitute a disclosure of fraud as articulated in the relevant cases.

Plaintiffs next argue that the Senate Finance Committee press release, announcing the initiation of an investigation into Almost Family, and the announcement of an SEC inquiry constituted disclosures of Defendants' fraud.  Both of these announcements cited the WSJ article, as well as earlier MedPAC findings, as bases for the investigations.  However, the press release made no specific allegation of fraud involving Defendants.[9]  Similarly, the SEC press release did not disclose any actual misconduct.  Numerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure.  *See In re Avista Corp. Sec. Litig.*, 415 F. Supp. 2d 1214, 1220-21 (E.D. Wash. 2005); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008); *In re Maxim Integrated Prods., Inc.*

---

[8]The Court also notes that the price of Defendants' stock noticeably *increased* following publication of the WSJ article, further supporting the position that it did not disclose any fraud to the market.

[9]In fact, the Court notes that the Senate Finance Committee recently completed its review of Defendants.  In its September 2011 Report, the Committee concludes that while Defendants appeared to have been "responsive to the incentive changes " in the Medicare payment model, such behavior could not be attributed to fraud.  That is, "none of the documents provided to the Committee by Almost Family show that executives ever pushed therapists to target thresholds or pursue more profitable clinical regimens."

*Sec. Litig.*, 639 F. Supp. 2d 1038, 1047 (N.D. Cal. 2009). This Court agrees with that logic as applied here.

In sum, these three "disclosures" revealed nothing more than a risk, *a possibility*, that Defendants may have made misrepresentations.  Under the relevant cases, however, these "disclosures" must have revealed new, unknown information, which would allow the market to respond to the actual revelation of misconduct.  Absent this, these articles and announcement fall far short of a disclosure of fraud.  Because this Court fails to identify any disclosure of fraud on behalf of Defendants, Plaintiffs have not satisfied their pleadings standards of loss causation. Without adequately pleading loss causation, Plaintiffs' Section 10(b) and Rule 10b-5 claim must fail.

## VI.

Plaintiffs also allege that Individual Defendants, Yarmuth and Guenthner, are liable under Section 20(a) of the Securities and Exchange Act, 15 U.S.C. § 78t(a).  "When a primary violation of securities law is shown," this provision imposes secondary "joint and several liability on 'controlling persons.'" *Omnicare*, 583 F.3d at 947.  Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable
> under any provision of this chapter or of any rule or regulation
> thereunder shall also be liable jointly and severally with and to the
> same extent as such controlled person to any person to whom such
> controlled person in liable . . . unless the controlling person acted
> in good faith and did not directly or indirectly induce the act or
> acts constituting the violation or cause of action.

To state a claim under Section 20(a), a complaint must adequately allege that underlying primary liability exists.  *Durgin v. Mon*, 415 F. App'x 161, 164 (11th Cir. 2011).  Having concluded that Plaintiffs fail to meet the pleading requirements of a Section 10(b) or Rule 10b-5

claim, their secondary-liability claim must also fail at this stage.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record